RAWLS, Judge
(dissenting).
It is my opinion that the trial judge was correct in dismissing the instant indictment.
A number of legal doctrines[1] may well be considered in analyzing the record adduced in the Granger case which resulted in a verdict of acquittal. The inescapable logical conclusion reached by the trial judge and overwhelmingly supported by the record in the Granger trial is: “ * * * the jury could not have reasonably rendered their verdict upon any other basis than a determination by them that the defendant was insane at the time and place, when and where, both Flora Kay Granger and Elizabeth Ann Wood were killed, and not at the time and place only when Miss Granger was killed; that the jury in finding the defendant not guilty by reason of insanity in the other case necessarily found and concluded that the defendant was insane at the time of the homicide in the instant case.”
As this Court held in Busbee v. State,[2] the doctrine of res judicata is just as applicable to a final judgment in a criminal prosecution as to those in civil cases. In my opinion, the principle of law upon which the trial judge relied and which is controlling in this cause, was stated in Busbee, supra, viz.:
“ * * * However, where the transactions giving rise to the two crimes are the same as a matter of fact, even though the offenses are not identical as a matter of law, a defendant may under the principle of res judicata, which is included in a plea under the broader doctrine of former jeopardy, show that the acquittal on the first charge was *295 necessarily controlled by the determination of a particular issue or issues of fact which would preclude his conviction of the second charge.”
Thus, applying the foregoing excerpt from Busbee, the essential question which must be answered in this cause is: Does the record in the Granger trial reflect without contradiction that the acquittal of defendant in that case necessarily determined a particular issue (defendant’s insanity at the time he killed Elizabeth Ann Wood), which would preclude his conviction in the instant case ? In my opinion the following excerpts from the Granger trial resolve the question in favor of the trial judge’s order dismissing the indictment.
The cause of Miss Wood’s death is most material to the issue. The record discloses that a shot was fired which injured Miss Wood, and that, subsquently, defendant stabbed her with a knife leaving 66 wounds. Dr. Joseph Davis, pathologist, the only witness testifying as to the cause of death in the Granger trial, stated:
(BY MR. HOPKINS)
“Q. Doctor, in summary what, in your opinion, caused the death of Miss Wood?
“A.. Multiple penetrating and blunt injuries.”
The testimony of the medical experts in the Granger trial is of essential materiality as to the mental condition of defendant at the time and place of the homicides.
Dr. William Merrill Corry Wilhoit, a qualified psychiatrist, testified on direct examination as follows:
(BY MR. WADSWORTH)
“Q. Dr. Wilhoit, based on your examination of the defendant, were you able to determine or do you have an opinion to a reasonable degree of medical certainty as to whether, at the time of the acts that this boy is charged with having committed on October 17, 1967, whether this boy was able to distinguish between right and wrong or whether this boy understood the nature and quality of his acts at that time?
“A. I have an opinion.
“Q. What is that opinion, sir?
“A. My opinion is that at that time he was not able to determine right from wrong; that he was not mentally competent at that particular time.”
On cross examination this witness further testified:
(BY MR. HOPKINS)
“Q. All right, sir. You think he realized he took those two girls to an isolated place known as Blue Sink in Leon County ?
“A. Yes, sir.
******
“Q. All right, do you think he realizes that he killed these people?
“A. I am not sure that he realized that he killed them, no, sir.”
On redirect examination the witness testified :
(BY MR. WADSWORTH)
“Q. Dr. Wilhoit, do you have an opinion as to whether any homicide committed by this boy out there at Blue Sink on October 17th was sex motivated in any way?
“A. I do have an opinion.
“Q. What is that opinion, sir?
“A. I do not think that it was sex motivated.”
On recross examination the witness testified :
(BY MR. HOPKINS)
“Q. All right, what did you understand was found at the scene ?
“A. My understanding was that found at the scene were two bodies of two girls *296 that had been stabbed repeatedly and perhaps hit with an object such as a hammer or axe, I’m not clear.
* * * * * *
“Q. All right. Now, I’m trying to find out, though, Doctor, and apparently you don’t want to change your opinion anyway, but I want to ask you something. Where does he lose his sanity and competency at Blue Sink in your opinion?
“A. Mr. Hopkins, he’s an individual who has, on many instances in situations of rejection, completely dissociated and not known what he was doing. On every instance that I could obtain before, there had been the equivalent of someone like a policeman on the spot to pull him away from someone when a fight or something had occurred. In this situation I think this man was completely psychotic when what took place, he did not know what was happening, what took place, he was not responsible for what—
ijí >Jí jfi >|c
“Q. Let’s get another hypothetical. Suppose this man had turned his automobile around with these two girls and started back to the highway and hypothetically suppose he stopped there and shot one of them?
MR. WADSWORTH: “Object to the question. It’s improper and it’s incompetent. There is no predicate for the question at all.”
THE COURT: “Objection overruled.”
MR. HOPKINS: “If the Court please, let me finish the question anyway.”
THE COURT: “Very well.”
“Q. He takes these girls down to the Blue Sink area, turns around, he starts back out the highway. He stops, he pulls the gun, one of them shot. Instead of coming back to the highway and town, he goes further on down in the woods. Was he thinking when he did that or not?
* * * * * *
“A. You say was he sane or insane?
“Q. Did he know what he was doing?
“A. He did at that particular time.
“Q. All right, sir, since you know what he was thinking about at that particular time, what was he thinking about when he went on in the woods instead of bringing that girl to the doctor ?
“A. You’re giving me a hypothetical question ?
“Q. Yes, sir.
“A. You want me to give you many different possibilities?
“Q. Yes, sir. Apparently what he was thinking about when he went on in the woods instead of bringing the girl to the doctor.
“A. All right, hypothetically he might have been—
“Q. I’m not talking about that. I-want your opinon.
“A. Well, my opinion is that at that particular time he might have been emotionally upset. He might have started up this way. It might have started a chain of events as it happened many times in this man’s earlier history when he completely was unaware of what he was doing, was pulled off someone which he was fighting. There are a number of instances in which he was completely oblivious to what was taking place for a short period of time in his history.”
Dr. Paul Satz, Clinical Psychologist with a specialty in Neuropsychology, Associate Professor of Psychology and Director of the Neuropsychology Laboratory at the University of Florida, was the next medical witness to testify as to defendant’s sanity at the time and place of the subject homicides. On direct examination he testified as follows:
(BY MR. WADSWORTH)
“Q. Dr. Satz, based on all of your examinations of Bobby Sanders down *297 there in Gainesville that you just described, do you have an opinion as to whether this boy, on October 17, 1967, at the time he is charged with having committed homicides here in Leon County, two girls, do you have an opinion as to whether at that time that hoy was able to distinguish between right and wrong or whether he was able to understand the nature and the quality of his acts ?
“A. No. In my opinion I do not feel that he was able to. Now, I feel badly to thrust a conclusive interpretation like that. I would hope you might want to be interested in how we arrived at it.
“Q. Well, I would ask you that. I know that you would like to explain that, Dr. Satz.
“A. It sounds a little pedantic to just come out with it.
“Q. Dr. Satz, let me ask you, to clarify this, do you have an opinion as to whether this boy knew right from wrong at that time?
“A. I do.
“Q. What is that opinion ?
“A. That he wasn’t able to make this kind of differentiation at that time.
“Q. Do you have an opinion as to whether this boy at that time understood the nature and quality of his acts?
“A. I do and I feel he was not able to.
% ‡
“A. Dr. Satz, let me ask you this. Do you have an opinion as to whether this boy on this night, assuming that he did kill these two girls, as to whether this homicide would have been sexually motivated ?
“A. My opinion with respect to that question, and I may not be completely direct, but let me try, is that he became so disorganized, — First of all, the pathology, the psychopathology was all there. The violent outburst of these impulses was so great that he lost, — had no control over rational behavior at this time and there was a flood of vicious, and I’m sure, maniacal outburst of behavior. As to whether, now — Your question, whether it was sexually motivated, I can’t accept that. I think that, you know, when a person becomes disorganized, becomes that bereft of his controlling ego controls or self-controls that so many other things are going to come out that as far as it was specifically sexually motivated, I can’t accept that. I see this as a breakdown of a human being.
“Q. Dr. Satz, if you were aware that one of the girls was found almost completely nude and that next to her were a pair of girls’ panties upon which was found a semenal stain, would that change your opinion?
“A. No.
“Q. Dr. Satz, if it is true that on October 17th that this boy did kill these two girls an if it is true that he did shoot them and stab them and horribly wound them would this indicate to you, — and if one of the girls was found nude, would that alter your opinion whatsoever, the opinion you have already stated ?
“A. No. I feel at that time he was just out of it, berserk, an animal, psychotic.”
On cross examination, he testified:
(BY MR. HOPKINS)
“Q. Now, let’s get back to the 17th of October. Is it your opinion he was oriented when he went to work ?
“A. Oriented to time, place and person most likely.
“Q. Do you think he was oriented when he got off from work?
“A. Now the anxiety started to mount at the anger, futility, frustration and the desperation that this boy had so long—
*298 * ifc * * * *
“Q. On this particular day when did he lose control, if you’ve figured him out ?
“A. I think when it was happening, he couldn’t control himself.
“Q. When what was happening?
“A. He was psychotic. He became an animal, a vicious animal, unable to think rational, to feel rational, upsurges of impulses, anger, hostility, to be totally disorganized as a human being. Somewhere? I don’t know. I’m not a mind reader to know when it happened.
“Q, Will you admit you don’t know?
“A. I don’t know at what time.
“Q. That’s right. Now, are you of the opinion that he knew when he shot the first girl?
“A. Knew what?
“Q. What he was doing?
“A. That he shot her, that he had a gun in his hand — ■
“Q. Did he know what he was doing?
“A. I think when that gun went off, as I can reconstruct it from interview, now, that this was the beginning of the disorganization and the upsurge of the psychotic behavior, the breakdown of the human being, and he was performing like an animal, a vicious animal.”
On redirect examination, he further testified :
(BY MR. WADSWORTH)
“Q. Under the same circumstances, Dr. Satz, if this boy were out in a car with two women or anybody, two men for that matter, or one man or any person, and all of a sudden a gun went off and then all of a sudden they jttmped at him and screaming and scratching and kicking and screaming, would the boy do the same thing again, in your opinion ?
“A. Oh, yes. Oh, yes, I would predict that this would happen. I wouldn’t want to put myself in a threatening position with him, particularly when the anxiety and the hostility has been mounting up, no.”
The final medical witness was Dr. Merton L. Ekwall who specializes in psychiatry. On direct examination he testified:
(BY MR. WADSWORTH)
“Q. Based on your examination of Bobby Sanders, Dr. Ekwall, including your full and complete examination, did you — were you able to reach an opinion as to whether or not, at the time of the alleged homicide that this boy was alleged to have committed on October 17, 1967, whether this boy at that time knew right from wrong or was able to distinguish between right and wrong or was able to understand the nature and quality of his act? Now, let me point out, Dr. Ekwall, when I say, 'at that time’ I don’t mean that date, I mean immediately before the homicides were actually said to have been committed, or was actually com-mittedf
“A. Right at that time I do not feel that he knew right from wrong or was able to know right from wrong.”
And on redirect examination he testified:
(BY MR. WADSWORTH)
“Q. Dr. Ekwall, do you have an opinion as to whether or not this boy, Bobby Sanders, was legally sane or insane at the time he is alleged to have committed the homicides — ■
;j? jjc ifc ;j: ifc
“A. I feel that at that precise moment he would be legally insane, in my opinion.”
[All emphases in testimony are supplied.]
The only logical conclusion that I can derive from this record is that, in the opinion of the medical experts, after the first shot was fired the defendant went *299 berserk and the jury concluded he was legally insane at the time he committed the homicides. The testimony is so interwoven as to the two homicides that it became homogenized and is not capable of being separated as to the instant homicide. As revealed by the foregoing excerpts of testimony, the State and the defense constantly propounded questions as to the “two girls” — “the homicides” — “the acts” in such a manner as to submit the question of defendant’s sanity at the time and place of both homicides to the jury to be resolved. The jury resolved this critical issue of fact in defendant’s favor. It is not, in my opinion, the prerogative of an appellate court to eject the trial jury from the jury box and at this stage propound the question, as the majority has done: “Does an insane person remember whether he was scared or not?” I would affirm the able trial judge’s order dismissing the instant indictment.
I dissent.

. See 9 ALR3d 210, 220, and 224, relative to the doctrines of res judicata and collateral estoppel.

. Busbee v. State, 183 So.2d 27, 29 (Fla.App.1st 1966).